**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**
**CIVIL CASE NO. 10-199-JGW**

**MARIA GUERRA**                                                                                   **PLAINTIFF**

**V.**

**DEPUTY MIGUEL RODRIGUEZ, et al.**                                          **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER[1]**

Pending before the Court are defendants' motion for summary judgment [Doc. 21] and

plaintiff's motion for partial summary judgment. Doc. 22. Also pending is plaintiff's motion to

strike two exhibits to defendants' motion for summary judgment. Doc. 25. For the following

reasons, plaintiff's motion for summary judgment will be denied, defendant's motion will be

granted in part and denied in part and plaintiff's motion to strike will be granted.

**I. Factual and Procedural History**

Plaintiff owns a business in Ohio which provides translation, interpreting and document

preparation services, primarily to the Hispanic community. In December 2009, plaintiff

accompanied three Hispanic males to the Kenton County Clerk's office, where the males

intended to transfer the titles to two vehicles. Pursuant to an ongoing investigation into

fraudulent registration of vehicles, Kenton County deputy sheriffs Miguel Rodriguez and Jeremy

Adams (collectively defendants) were called to the Clerk's office to speak to plaintiff and the

Hispanic males ("the males").

The deputies spoke to the males, who stated that they were there to register vehicles.

When asked for identification by defendants, the males gave defendants what purported to be

---

[1]All parties have consented to disposition by the magistrate judge. 28 U.S.C. §636(c).

international drivers' licenses.  The males also told defendants that plaintiff had accompanied

them to the Clerk's office for translation purposes.  The defendants believed the international

drivers' licenses to be fraudulent because they were not issued by an official governmental

agency.[2]

Defendants spoke to plaintiff and ascertained that she had not verified that the addresses

listed on the vehicle transfer documents were correct before notarizing them.  Defendants also

believed the forms to be improper because they contained the males' tax identification numbers

instead of their social security numbers.  The males and plaintiff were arrested.[3]  Plaintiff was

charged with two counts of second-degree forgery.  Following her arrest, plaintiff consented to a

search of her place of business in Ohio.  A warrant to search plaintiff's business was also issued

---

[2]An international driver's license, also known as an international driving permit, "must be issued in the same country as the driver[']s license of the traveler" and is "an official translation of your . . . license into 9 foreign languages and is recognized as valid identification in 174 countries around the world."  *See*  http://www.thenac.com/idp_faqs.htm.  Defendants' belief that an international driver's license is issued by the United States government is incorrect. The United States Department of State refers persons desiring an international driver's license to the American Automobile Association (AAA) or the National Auto Club, both of which are non-governmental entities.  *See* http://travel.state.gov/travel/tips/safety/safety_1179.html.

[3]To bolster their arguments that plaintiff's arrest was based on probable cause, defendants point to the fact that the males later pleaded guilty to the misdemeanor offense of criminal possession of a forged instrument in the third degree.  *See* Docs. 21-1, p. 2; Doc. 21-2.  However, a proper assessment of whether probable cause for an arrest existed must be based upon the facts known to the arresting officers at the time of arrest.  *See, e.g., Arnold v. Wilder*, 657 F.3d 353, 363 (6th Cir. 2011).  The Court cannot therefore use the after-acquired knowledge of the males' guilty pleas to assess whether plaintiff's arrest was based upon probable cause.  In addition, as will be discussed later, defendants' failure to timely provide the males' court records in discovery means that defendants cannot rely upon those records.  Similarly, the fact that the grand jury declined to indict plaintiff does not necessarily mean that defendants lacked probable cause to arrest plaintiff.  *See, e.g., Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) ("the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest.").

by the Hamilton County, Ohio Municipal Court. Although Adams was present, plaintiff's business premises were searched by police from the City of Silverton, Ohio.

For reasons not apparent from the record, the grand jury ultimately declined to indict plaintiff. Plaintiff then brought this action against defendants pursuant to 42 U.S.C. §1983. Plaintiff raises three causes of action: false arrest, malicious prosecution, and improper search of her business. Plaintiff's claims are brought against defendants in their individual capacities only. Defendants have moved for complete summary judgment; plaintiff seeks partial summary judgment only on defendants' liability for her false arrest and malicious prosecution claims. The Court will grant defendant's motion for summary judgment on the malicious prosecution and improper search claims only.

## II. Analysis

### A. Standard of Review

Summary judgment is proper only if the facts on file with the court demonstrate not only that no genuine issue of material fact remains to be resolved but also that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party may discharge its burden by "pointing out . . . an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party cannot rest on its pleadings, but must identify specific facts that remain in dispute for the finder of fact at trial. *See id.* at 324. Although all inferences are drawn in favor of the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986), the nonmoving party must present significant and probative evidence in support of its complaint. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

The court's function is not to weigh the evidence and determine the truth of the matters asserted, but to determine whether a genuine issue of material fact remains for a fact finder at trial. *Id.* at 249. The inquiry is whether the evidence presents a "sufficient disagreement to require submission [of the case] to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404-05. The standard of review does not change when both parties move for summary judgment, nor does the presence of cross-motions mean that summary judgment must be granted. *See, e.g., McKim v. NewMarket Technologies, Inc.*, 370 Fed.Appx. 600, 603 (6th Cir. 2010); *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592-93 (6th Cir. 2001).

### B. Qualified Immunity

To prevail on her civil rights claim under §1983, plaintiff must "establish that a person acting under the color of state law deprived [her] of a right secured by the Constitution or laws of the United States." *Everson v. Leis*, 556 F.3d 484, 493 (6th Cir. 2009). In addition, plaintiff "must also overcome the defense of qualified immunity, which shields government officials from personal liability 'for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006)).

4

The issue of whether a governmental actor is entitled to qualified immunity is a question of law to be resolved by the Court. *Id.* at 494. Plaintiff bears the burden to show that defendants are not entitled to qualified immunity. *Smoak*, 460 F.3d at 778. A qualified immunity analysis consists of two steps: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005).

The "initial inquiry" must be "whether a constitutional right was violated, if the allegations are established." *Id.* at 311. If a Court determines that a constitutional right has been violated, it must then determine if the right was clearly established. "A right is 'clearly established' for qualified immunity purposes when the contours of the right are sufficiently clear, even if the specific action in question has never been held unlawful." *Smoak*, 460 F.3d at 778. "The relevant inquiry is whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Qualified immunity is designed to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

**C. False Arrest Claim**

Plaintiff's first cause of action is for false arrest. For the following reasons, I conclude that defendants are not entitled to qualified immunity on that claim and will deny both plaintiff's and defendants' motions for summary judgment on the false arrest claim.

The Fourth Amendment protects individuals from unreasonable searches and seizures. Plaintiff's claims against defendants hinge upon the legality of her arrest. "A person who has been the victim of an unlawful arrest or wrongful seizure under the color of law has a claim

based on the Fourth Amendment guarantee that government officials may not subject citizens to searches or seizures without proper authorization." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009). The validity of an arrest "does not depend on whether the suspect actually committed a crime . . . ." *DeFillippo*, 443 U.S. at 36. Instead, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Accordingly, for a wrongful arrest claim under §1983 to be successful, a plaintiff must prove that the arresting officers lacked probable cause. *Findley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). In other words, "[t]he existence of probable cause, therefore, negates an essential element of a §1983 suit alleging deprivation of constitutional rights under color of law." *Garner v. Grant*, 328 Fed.Appx. 325, 327 (6th Cir. 2009) (internal quotation marks omitted).

Probable cause exists "if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). The probable cause inquiry "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152. "[T]he probable cause inquiry is a factually intensive one." *Eubank v. Wesseler*, 2011 WL 3652558, at *6 (E.D.Ky. Aug. 19, 2011). Thus, unless only one reasonable determination is possible, the existence of probable cause in §1983 claims is a question to be resolved by a jury.[4] *Logsdon*, 492 F.3d at

---

[4]Some authority holds that in making a probable cause determination, the Court need only find that defendants had arguable–not actual-- probable cause to arrest plaintiff. *See, e.g., Dier v. City of Prestonsburg, Ky.*, 480 F.Supp.2d 929, 936 (E.D.Ky. 2007) ( "Rather, the Officers are immune from suit if the Officers *arguably* had probable cause to arrest, i.e., was it reasonable to believe probable cause existed."). "The standard for arguable probable cause is

341. Moreover, though plaintiff was arrested for forgery in the second degree, the Court's inquiry is not limited to whether defendants only had probable cause to arrest her for that offense because even "where no probable cause exists to arrest a plaintiff for a particular crime, but . . . probable cause exists to arrest that plaintiff for a related offense, the plaintiff cannot prevail in a suit alleging wrongful arrest brought pursuant to 42 U.S.C. § 1983." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 676 (6th Cir. 2005). The Court therefore will examine whether the officers had probable cause to arrest plaintiff for either forgery in the second degree (the actual offense with which plaintiff was charged) and/or criminal facilitation of the males' possession of a forged instrument (the related offense defendants now contend plaintiff could have been charged with having committed).

### 1. Forgery in the Second Degree

Defendants rely upon the following facts and inferences to support the forgery charge. Plaintiff notarized the documents without verifying the males' address(es); the males' international drivers' licenses were fakes; the vehicle transfer documents contained the males' tax identification numbers instead of social security numbers; and it may be inferred that plaintiff filled out the transfer documents for the males. Summary judgment is inappropriate, however,

---

whether a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law." *Eubanks v. Gerwen*, 40 F.3d 1157, 1160 (11th Cir. 1994).

The arguable probable cause standard in *Dier* stems from the Sixth Circuit's holding that "probable cause determinations, even if wrong, are not actionable as long as such determinations pass the test of reasonableness." *Jeffers v. Heavrin*, 10 F.3d 380, 381 (6th Cir. 1993). *Jeffers*, however, does not use the term "arguable probable cause." Indeed, the Court has not been cited to, nor has it independently located, an opinion by the Sixth Circuit or Supreme Court which affirmatively directs trial courts to use an "arguable probable cause" standard. Under the facts of this case, however, neither plaintiffs nor defendants are entitled to summary judgment on the false arrest claim regardless of whether the arguable probable cause standard is utilized.

because those factors are insufficient to lead to only one conclusion regarding whether there was probable cause for plaintiff's arrest.

### a. Elements of Forgery Offense

Kentucky Revised Statutes (KRS) 516.030 provides in relevant part that:

 (1) A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument which is or purports to be or which is calculated to become or to represent when completed:
 * * *
 (b) A public record or an instrument filed or required or authorized by law to be filed in or with a public office or public employee; or
 (c) A written instrument officially issued or created by a public office, public employee or governmental agency.

So to have committed forgery in the second degree plaintiff must have: 1) intended to defraud or deceive another by 2) falsely making or completing a written instrument 3) which is or purports to be a public record or instrument required or authorized to be filed with a public office.

### b. Notarization Without Address Verification

In his deposition, defendant Rodriguez testified that plaintiff was arrested because of the information received from the males (incorrect/inconsistent addresses on documents) and because plaintiff notarized the documents without first verifying the listed addresses.  Doc. 18-1, p. 37.  Similarly, defendant Adams testified in his deposition that he believed that plaintiff had vouched for the accuracy of the documents' contents when she notarized them.  Doc. 19-1, p. 28 ("She is notarizing it basically stating that the information that she is helping them fill out on this, what they call the VTR, the application for motor vehicle registration, is accurate.").

When Rodriguez was asked on cross-examination at his deposition whether plaintiff's

lack of knowledge of the males' addresses formed the basis for defendants determining that

plaintiff had committed a crime, Rodriguez answered "[t]hat, along with the information that we

received from the two gentlemen [the males], yes." *Id.* at p. 37. Immediately thereafter, the

following relevant colloquy occurred:

> Q. [by Robert Newman, counsel for plaintiff] And the information from the two
> gentlemen was that they didn't live at the address?
> A. That she knew, and as a matter of fact --
> Q. And that she knew what? Finish that sentence, that she knew what?
> A. That she knew that they didn't live there.
> ***
> Q. Okay. How -- on what basis did you conclude -- you concluded later on that she knew
> that they didn't live at the address, I presume?
> A. From what she stated, correct.
> Q. Okay. Well, how did you conclude that she knew that they didn't live at the address?
> A. She stated that.
> Q. When?
> A. In the interview.
> ***
> Q. Well, my question is, do you have a specific recollection of asking her if she knew
> that this gentleman did not live at this address?
> A. Well, like I mentioned earlier, we had asked her if she knew that these two gentlemen
> lived at these addresses, she stated she did not, number one. Number two, again, the SSN
> number. Number three, the fact that she was allowing them to use the international
> driver's license to notarize these. If you look at the international driver's license,
> obviously the address is stating a different address.
> Q. Okay. She said that she didn't know whether they lived at this address or not?
> A. Correct.
> ***
> Q. . . . What is the basis for your concluding that she knew that the information on the
> forms was not accurate?
>  A. Again, stating that she did not -- that she knew that those gentlemen did not live there
> or had not confirmed so.
> Q. So your -- let me make sure that we're consistent with what she said before. I think
> you
>  said before that she didn't know whether or not those addresses were correct, not that she
>  knew that they were false addresses. Isn't what you said previously?
> A. Sure.
> Q. Okay.
> A. It's the same -- it's the same thing, you can word it as you want. She knew that they
> didn't live there and she had notarized it without checking into whether they did live there

or not.

Q. Okay. There's a slight difference maybe, but anyway --

A. You say tomato and I say tomato.

Q. Well, she didn't know whether or not in fact that they lived at the address, yet she signed the -- she notarized the form, correct?

A. As I stated previously and I'll state again, she did not know they didn't live there, she didn't check, she didn't ask for addresses, mail, nothing. She notarized something without knowing for a fact they lived there or not.

*Id.* at p. 37-54.

Contrary to Rodriguez's assertion, there is more than a semantic difference between plaintiff not knowing whether the males' listed addresses were correct and plaintiff actually knowing that the addresses were incorrect. Simply put, ignorance of whether a statement is true is not synonymous with knowing a statement is false. More importantly, and in any event, plaintiff was not required to ascertain the males' address(es) in order to perform notarization services.

Contrary to defendants' belief, a notary is not required to vouch for the accuracy of the contents of documents before notarizing them. The relevant statues of both Ohio (where the notarization took place) and Kentucky (where the arrest occurred) require a notary to either know the person making an acknowledgment or to be presented with satisfactory evidence of the identity of the person making an acknowledgment.[5] Those statutes do not, however, contain language requiring a notary to vouch for the contents of the documents for which notarization is sought. This is in accordance with the general rule that "[a] notary does not swear to the truth of the information in the document being notarized." 1 Am.Jur.2d *Acknowledgements* §97 (2011).[6]

_____

[5]*See* Ohio Revised Code (ORC) Chapter 147; KRS Chapter 423.

[6]*See also Saevoff v. Steffen*, 212 P. 158, 159 (Wash. 1923) ("No case has been cited to us, and an independent investigation has disclosed none, wherein a notary public has been held

Plaintiff's duty as a notary was to verify the males' identities before notarizing the documents. Plaintiff performed that duty and nothing more was required. So the uncontested fact that plaintiff did not verify the addresses listed in the documents before notarizing them does not support probable cause to believe plaintiff had committed forgery.

### c. International Drivers' Licenses

As noted previously, defendants incorrectly believe that international drivers' licenses are issued by a governmental entity. Rodriguez testified that the males admitted their international drivers' licenses were fakes. Doc. 18-1, p. 22. Even so, there is no concrete evidence that plaintiff knew the licenses were not authentic. There is, however, evidence from which it could be inferred that plaintiff knew or should have known that the licenses were not authentic.

Plaintiff testified in her deposition that she did not assist the males in obtaining the purportedly fraudulent international drivers' licenses. *See* Doc. 20, p. 44. Indeed, plaintiff testified that she told defendant Rodriguez that she did not know that any documents possessed by the males were forged or illegal.[7]

_____

liable on his bond for signing a jurat to an affidavit wherein the affiant swore falsely.").

[7]Plaintiff's deposition contains the following pertinent questions and answers:
Q. [by Jason Reed, counsel for defendants] And do you recall anything about the substance of that conversation, besides him [defendant Rodriguez] asking you what you were doing and you were telling him that you were there --
A. I was answering him what I was doing, interpreting services. And he said that if I knew that everything I was doing was fraudulent. I said no, sir, it's not fraudulent, I'm here to interpret. He said -- he said, you know what you're doing is illegal, helping illegals. And he said you know they don't have a driver's license, you know these papers are fake. And I said no, sir, they're not fake. And he kept insisting that they were fake. And I told him no. And he asked me if I had -- how do I know these people? And I told him about my business and that people recommended me. And he said, well, all those people that you help are illegal and this is what you get for working for illegals, stuff -- comments like that.

Nonetheless, during his deposition defendant Adams testified on cross-examination that he believed plaintiff knew the males' drivers' licenses were fakes. In pertinent part, Adams testified as follows:

Q. [by Robert Newman, counsel for plaintiff] Okay. I mean, did you talk to her about any of the documents --
A. I did.
Q. -- or what was going on? Tell me what --
A. Once she had gotten off the phone, she was visibly upset, was crying, very upset. And I tried to get her calmed down a little bit. . . .

She looked at me and basically stated, I don't understand any of this. And I told her -- I mean, I think my exact words were, it's quite simple, you're using fake IDs, you're using fraudulent information on vehicle registrations -- in order to obtain vehicle registrations. And I think I was pretty much at that point with her when I told her that.

From there, she again said, well, I don't understand. I explained to her, international driver's licenses don't exist, these are fake. And I even made a comment to her about international driver's licenses have to be a pamphlet or a booklet, usually in a passport form accompanied with that. And she indicated to me, she goes, I know. . . .
Q. Okay. Okay. You had this discussion with her where you made these statements that these were fraudulent international driver's licenses.
A. Yes.
Q. And you stated the reasons why they were fraudulent international driver's licenses. She never acknowledged to you, did she, that she knew that these were fraudulent international driver's licenses, did she?
A. Yes.
Q. She did?
A. I just -- as I just explained to you, she made the statement, I know.
Q. Okay.
A. Which to me --
Q. Okay.
A. -- means that she knew.

*See* Doc. 19-1, p. 15 -18.

So the evidence shows that the males' international drivers' licenses were admittedly

---

Doc. 20, p. 54-55.

inauthentic. It is uncontested that plaintiff is familiar with international drivers' licenses. If defendants, who do not possess the sophisticated knowledge of international drivers' licenses which plaintiff enjoys, readily ascertained that the licenses were inauthentic a jury could reasonably conclude that plaintiff knew (or should have known) that the licenses were fake. However, plaintiff denies knowing that the licenses were not authentic and there is no evidence to conclusively contradict that assertion. In short, the conflicting evidence on this point counsels against granting summary judgment to either plaintiff or defendants.

### d. Usage of Tax Identification Number

Defendants believe the males' usage of a tax identification number in lieu of a social security number on the vehicular forms is incriminating. Specifically, defendant Adams stated on cross-examination during his deposition that plaintiff knew that it was improper to use a tax identification number in lieu of a social security number because "she is aware, having been a tax preparer, of the ITN numbers, she knows what they are, she knows what they are used for, she knows what they are not allowed to be used for. She knows this, this is what she does for a living." Doc. 19-1, p. 21-22. However, Adams also admitted that "some clerks were allowing" usage of tax identification numbers. *Id.* at p. 23.

Plaintiff likewise testified that she was told by an employee of the Campbell County, Kentucky Clerk's office that it was permissible to use tax identification numbers to effectuate titling of vehicles. *See* Doc. 20, p. 79-81. Plaintiff further similarly testified that no one at the Kenton County, Kentucky Clerk's office had raised any previous concerns about using tax identification numbers on vehicle title or registration forms. *Id.* at 80.

Even assuming solely for purposes of argument that tax identification numbers should

not properly be used on vehicular transfer forms, the fact that they were used by the males does not incriminate plaintiff because she (and the males) were only engaging in behavior that was permitted by the clerks–who are the local officials charged with titling and registering vehicles.

**e. Filling Out Forms for Males**

The males' purported international drivers' licenses bore Cincinnati, Ohio addresses yet the males were attempting to register vehicles in Kentucky and Kentucky addresses were listed on the vehicular documents. Rodriguez testified at his deposition that the males had admitted that they had never lived in Kentucky, despite the Kentucky address listed on the vehicular forms. *See* Doc. 18-1, p. 22 ("I asked them where they [the males] lived. They both stated they lived in Cincinnati. Asked them, had they ever lived in Kentucky; they stated no, that they were planning on moving to Kentucky. I asked them if they lived at the address that was notarized and put on the title, they both advised they did not live there. They were planning on moving there at some point but did not live there."). Defendants rely upon the obvious discrepancy between the addresses listed on the males' purported international drivers' licenses and those listed on the vehicular forms to buttress their argument that plaintiff, who typically completed vehicular forms for her clients, knew that the males were attempting to commit forgery and was assisting their criminal efforts (i.e., there was probable cause to arrest plaintiff for forgery).

In her deposition, plaintiff testified that she generally filled out paperwork for vehicle transfers. Doc. 20, p. 31. Inexplicably, plaintiff was not directly asked during her deposition whether she filled out the paperwork for the males. As the record currently stands, therefore, it cannot be known whether plaintiff filled out the vehicular forms for the males. Accordingly, defendants could have inferred that plaintiff had filled out the paperwork for the males,

especially given the males' lack of mastery of the English language. *See, e.g., Cerrone v. Brown*, 246 F.3d 194, 203 (2nd Cir. 2001). ("Even on summary judgment, where all facts must be viewed in the light most favorable to the non-moving party, for the purpose of qualified immunity and arguable probable cause, police officers are entitled to draw reasonable inferences from the facts they possess at the time of a seizure based upon their own experiences."). Likewise, based upon the record currently before the Court, a reasonable juror could–but would not be required to–reasonably infer that plaintiff completed the paperwork for the males.

### f. Conclusion

It is clear that the record does not compel a finding that probable cause existed to believe plaintiff intended to deceive anyone by falsely making or completing the vehicular documents. Likewise, neither can it be said with certainty that no grounds whatsoever existed for defendants to charge plaintiff with forgery. Accordingly, the parties have not pointed to sufficient facts to establish that only "one reasonable determination is possible[,]" *Logsdon*, 492 F.3d at 341, meaning that the question of whether probable cause existed to arrest plaintiff for forgery "is a question to be resolved by a jury."[8] *Id.* The Court will now address defendants' alternate argument that they had probable cause to arrest plaintiff for criminal facilitation.

### 2. Criminal Facilitation

KRS 506.080(1) provides that "[a] person is guilty of criminal facilitation when, acting with knowledge that another person is committing or intends to commit a crime, he engages in

---

[8]This conclusion applies whether the light is looked at in the light most favorable to plaintiff (as must be done when analyzing defendants' motion for summary judgment) or in the light most favorable to defendants (as must be done when analyzing plaintiff's motion for summary judgment).

conduct which knowingly provides such person with means or opportunity for the commission of the crime and which in fact aids such person to commit the crime." To be guilty of facilitation, plaintiff need not have wanted the males to successfully commit a crime as "[f]acilitation reflects the mental state of one who is 'wholly indifferent' to the actual completion of the crime." *Perdue v. Commonwealth*, 916 S.W.2d 148, 160 (Ky. 1995). To commit facilitation, however, plaintiff must have known that the males intended to commit a crime because "[b]y its plain meaning, criminal facilitation requires the facilitator to know that the principal actor intends to commit a crime." *Finnell v. Commonwealth*, 295 S.W.3d 829, 833 (Ky. 2009) (internal quotation marks omitted). Even though a facilitator must know the principal intends to commit a crime, "a facilitator need only be a knowing, cooperative bystander with no stake in the crime." *Monroe v. Commonwealth*, 244 S.W.3d 69, 75 (Ky. 2008).

As can be seen from the previous discussion regarding forgery, the record does not compel a conclusion as to whether plaintiff knowingly and falsely assisted the males' commission of an offense. As the record does not contain evidence to establish that only "one reasonable determination is possible[,]." *Logsdon*, 492 F.3d at 341, the issue of whether probable cause existed to arrest plaintiff for facilitation "is a question to be resolved by a jury." *Id.*

### 3. Clearly Established Right

Having determined that the record supports more than one conclusion (i.e., there is a jury question) regarding whether defendants had probable cause to arrest plaintiff for either forgery or facilitation, the Court will consider "whether Plaintiff's right to be free from wrongful arrest was so clearly established that [defendants] should have known it." *Eubank*, 2011 WL 3652558, at *10. This analysis is necessary because "[t]hough the evidence is such that a reasonable jury

16

could conclude that [defendants] violated [plaintiff's] constitutional rights, [they] may still be entitled to qualified immunity. Even where an officer has violated a plaintiff's constitutional rights, that officer is entitled to qualified immunity if the right that he violated was not 'clearly established' at the time of the violation." *Webb v. Greene County Sheriff's Office*, 494 F.Supp.2d 779, 794 (S.D.Ohio 2007). In making that determination, "the relevant question is whether an officer could have reasonably believed that her actions were lawful, in light of the facts and the law as generally understood at the time of her actions." *Id.*

No party has cited to a case with similar facts, nor has the Court's independent research revealed such a case. However, there does not have to be a case completely and directly on point in order for a right to be deemed to have been clearly established. *See, e.g., Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 215 (6th Cir. 2011) ("'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning,' and it is not necessary that 'the very action in question ha[ve] previously been held unlawful.'" *Hope v. Pelzer*, 536 U.S. 730, 740–41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (internal quotation marks omitted). '[N]otable factual distinctions' between prior decisions and the facts of a case do not resurrect qualified immunity 'so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.' *Id.* at 740, 122 S.Ct. 2508 (internal quotation marks omitted)").

At the time of plaintiff's arrest, it was "well established that any arrest without probable cause violated the Fourth Amendment." *Webb*, 494 F.Supp.2d at 794 (citing, e.g., *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003)). Moreover, the Kentucky statutes setting forth the elements of forgery in the second degree (KRS 516.030) and facilitation (KRS 506.080) have not been amended since their enactment in 1974, so defendants should have been

well versed in the elements of each offense.  The Court concludes therefore that plaintiff's right to be free from an arrest without probable cause was clearly established at the time of her arrest.

### 4.  Plaintiff's Motion for Summary Judgment

As previously discussed at length, the record lends itself to more than one conclusion regarding whether plaintiff's arrest was based upon probable cause.  Like defendants' motion, therefore, plaintiff's motion for summary judgment on the false arrest claim must be denied.

### D.  Malicious Prosecution

Plaintiff's second cause of action is for malicious prosecution.  For the following reasons, plaintiff's motion for summary judgment on that claim will be denied and defendants' motion will be granted.

### 1.  General Elements

A constitutionally cognizable claim for malicious prosecution is distinct from a claim of false arrest.  *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010).   False arrest remedies detention without legal process; malicious prosecution remedies detention caused by the wrongful institution of legal process.  *See Wallace v. Kato*, 549 U.S. 384, 389-90 (2007).  The Sixth Circuit has held that a malicious prosecution claim under federal law "'encompasses wrongful investigation, prosecution, conviction and incarceration.'"  *Sykes*, 625 F.3d at 308 (quoting *Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir. 2006)).

Prior to *Sykes*, precedent in this circuit held that "§ 1983 claims predicated on malicious prosecution necessarily failed if probable cause for the arrest was established."  *Amine v. King*, 2011 WL 4387229, at *11 (E.D.Mich. Sep. 21, 2011).  However, lack of probable cause is no longer the sole factor to consider.  The Sixth Circuit in *Sykes* clarified the law by holding that:

To succeed on a malicious-prosecution claim under § 1983 when the claim is premised on a violation of the Fourth Amendment, a plaintiff must prove the following: First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute." *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir.2007); Second, because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution. Third, the plaintiff must show that, "as a consequence of a legal proceeding," the plaintiff suffered a "deprivation of liberty," as understood in our Fourth Amendment jurisprudence, apart from the initial seizure. Fourth, the criminal proceeding must have been resolved in the plaintiff's favor.

625 F.3d at 308-09 (footnote and citations omitted).[9]  Accordingly, "a finding of no constitutional violation with respect to the arrest does not automatically dispose of a corresponding malicious prosecution claim." *Amine*, 2011 WL 4387229, at *11.

The Court has already discussed the probable cause factor at length and has concluded that more than one reasonable conclusion can be reached regarding whether plaintiff's arrest was supported by probable cause. Though probable cause to prosecute is a distinct legal issue from probable cause to arrest, the answer to the question of whether plaintiff's prosecution was supported by probable cause is dependent upon the answer to the ancillary question of whether plaintiff's arrest is supported by probable cause. After all, there would not be probable cause to prosecute plaintiff for forgery (or facilitation) if defendants lacked probable cause to arrest plaintiff. Nonetheless, defendants are entitled to summary judgment because the record does not

---

[9]*Sykes* was issued in November 2010, approximately two months after this action was filed. Though the issue was not directly discussed in the opinions, this Court has applied the *Sykes* standard to cases that were filed before *Sykes* was issued. *See, e.g., Carter v. Porter*, 2011 WL 778408 (E.D.Ky. March 1, 2011); *Burden v. Paul*, 2011 WL 4431819 (E.D.Ky. Sep. 22, 2011).

support a conclusion that either defendant actively participated in the prosecution of plaintiff.[10]

## 2. Deprivation of Liberty and Resolution of Criminal Proceedings in Plaintiff's Favor

The failure of the grand jury to indict plaintiff satisfies the requirement that the criminal proceeding must have been resolved in plaintiff's favor. *See, e.g., Shipp v. United States*, 2005 WL 2464669, at *6 (W.D.Tenn. Oct. 3, 2005) (holding that grand jury's failure to return indictment meant that criminal proceeding was terminated in plaintiff's favor for malicious prosecution claim); 54 C.J.S. *Malicious Prosecution* §66 (2011) ("A failure or refusal of the grand jury to indict or a quashing of an indictment or information are in general a sufficient termination of the proceedings."). Plaintiff was arrested, taken to jail and was not arraigned until the next morning. Doc. 20, p. 65-66. Accordingly, she suffered a sufficient deprivation to make a claim for malicious prosecution. *See, e.g., Amine*, 2011 WL 4387229, at *12 (holding that arrest, booking and pretrial release on bond were sufficient to constitute a deprivation of liberty for malicious prosecution purposes).

## 3. Participation in Prosecution

### a. Rodriguez

At his deposition, Rodriguez testified that after plaintiff's arrest he took no role in the prosecution of plaintiff.[11] Plaintiff's deposition does not contain a discussion of what role, if

---

[10]The Court's review of the *Sykes* factors is hampered by the fact that the parties inexplicably do not discuss *Sykes* in their briefs.

[11]In pertinent part, Rodriguez's deposition contains the following colloquy:
Q. [by Robert Newman, counsel for plaintiff] The charges were actually filed against Ms. Guerra, correct?
A. Correct.

any, Rodriguez played in the decision to present the charges against plaintiff to the grand jury.

In short, there is nothing to contradict Rodriguez's assertion that he played no post-arrest role in

---

Q. And they went to court?

A. Again, my partner took care of that case, I can't speak about the court.

Q. And the charges were dismissed. Were you aware of the dismissal by the prosecution of the charges?

A. I found out a while after this.

Q. Okay. Well, did you find out why the charges were dismissed?

A. Am I free to talk about that whole situation?

MR. REED [counsel for defendants]: I don't think there's any attorney/client privilege that attaches to it. But let me enter an objection for now and instruct you not to answer. We'll need to look into that, because I think it was a decision by the Commonwealth in connection with grand jury proceedings, and I don't know if we --

Q. Okay. You are instructed not to answer that. Let me just kind of dance around that to get some context of this. Who informed you of the decision to dismiss the charges?

MR. REED: For the record, they were no true billed at the time of grand jury presentation. So I don't know that it is fairly characterized [as] a prosecutorial dismissal at that point.

Q. Oh. Okay. So the grand jury didn't indict, correct?

A. If that's -- again, I wasn't involved in --

Q. Did you testify before the grand jury?

A. I was not involved in any of the court processes with Ms. Guerra.

Q. Do you know if your colleague, Mr. Adams, would have testified before the grand jury?

A. I do not. A few weeks, I would say, after this whole case is when I went to the DA, we're in two different offices.

Q. Well, then -- but somebody informed you that the grand jury didn't indict or somebody informed you that the case was not -- did not go -- go forward?

A. I was told there was property that needed to be returned, that's all I was told.

Q. Oh. That's all?

A. So obviously I pretty much knew what that meant.

Q. Okay. Well, a privilege has been interposed here. I mean, did you have a discussion with the Commonwealth attorney?

A. Again, I don't think I can speak about that right now.

Q. That's -- I understand that. But you did have a discussion with the Commonwealth attorney?

A. Afterwards, yes.

Doc. 18-1, p. 68-70.

the decision to prosecute plaintiff. Consequently, plaintiff's malicious prosecution claim against Rodriguez must fail.[12]  *See Sykes*, 625 F.3d at 308, n.5 ("To be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating.").

### b. Adams

Though the precise contours of his role are unclear, it is clear that Adams had more of a role in the prosecution of plaintiff than did Rodriguez. However, there is no indication that Adams took sufficient active steps in the prosecution to be liable for malicious prosecution.

At his deposition, Adams testified as follows:

> Q. [by Robert Newman, counsel for plaintiff] As we know, the grand jury did not indict. And again, there may be an interventional [sic] privilege here, but did you talk to anybody -- well, did you talk to anybody about whether the case should go forward to the grand jury or about whether -- whether or not the charges should be dropped or anything along those lines?
> A. I did speak to somebody. I did speak to one of our prosecutors about the case, as far as how to proceed forward. I never spoke to anybody about dropping or dismissing the case. But I did speak to one of our prosecutors about how to proceed forward with it, yes, sir.
> MR. NEWMAN: Do you want to interrupt me here?
> MR. REED [counsel for defendants]: I think you're okay so far.
> Q. So you had a conversation with the prosecutor, you said, about how the case

---

[12]Defendants contend in their motion for summary judgment that "[a]t arraignment, Plaintiff waived her preliminary hearing, thereby allowing the case to be considered by the Kenton County Grand Jury. Without presentment of evidence from either of the Deputies or otherwise, the case was returned by the Kenton Commonwealth Attorney as 'No True Bill.'" Doc. 21-1, p.2-3. However, the deposition excerpts cited by defendants to support their summary of the criminal proceedings against plaintiff do not contain a discussion of whether plaintiff waived a preliminary hearing or what–if any--evidence was presented to the grand jury. Moreover, the record of the state court criminal proceedings against plaintiff is not in the record before this Court. The Court cannot know therefore who–if anyone–testified before the grand jury or what relevant statements–if any–were made at plaintiff's arraignment. Indeed, it is unclear whether the grand jury independently chose to return a no true bill or whether it did so at the prosecutor's request.

should go forward. All right. Did -- take a pause before answering this, did
anybody ever tell you why the case did not go forward?
MR. REED: Objection, instruct you not to answer.
Q. Okay. Did you, yourself, at any point recommend that the case not go forward?
A. No.

Doc. 19-1, p. 40-41.

Plaintiff has pointed to nothing which could lead to a conclusion that Adams

intentionally lied, misled or exerted pressure or strong-arm tactics toward the prosecutor in an

effort to persuade the prosecutor to pursue forgery charges against plaintiff.  In other words,

Adams's participation in the prosecution of plaintiff appears to have been the type of routine role

played by arresting officers in subsequent prosecutions.

The Sixth Circuit has made plain that "[i]t is absolutely clear . . . that an officer will not

be deemed to have commenced a criminal proceeding against a person when the claim is

predicated on the mere fact that the officer turned over to the prosecution the officer's truthful

materials." *Sykes*, 625 F.3d at 314.   Instead, in order to have participated in the decision to

prosecute an officer must have committed wrongful acts such as making misrepresentations to

the prosecutor or testifying falsely at a preliminary hearing.  *Id.*  at 313-317 (finding officers

participated in prosecution of plaintiff because they testified falsely at a preliminary hearing and

provided investigatory materials to the prosecutor which contained affirmative

misrepresentations).  Plaintiff has not shown where Adams intentionally misrepresented the facts

to the prosecutor or testified falsely at any hearing.  Adams is therefore entitled to summary

judgment on plaintiff's malicious prosecution claim.

### E.  Search and Seizure Claim

Plaintiff's final claim is that the search of her business violated the Fourth Amendment.

Defendants contend they are entitled to summary judgment because plaintiff gave consent for the search and an Ohio court issued a search warrant. Plaintiff does not address this issue in her responsive brief.

It is uncontested that plaintiff gave defendants permission to search her office. "A warrantless search and seizure does not violate constitutional rights where the individual has voluntarily consented to the search." *Slough v. Telb*, 644 F.Supp.2d 978, 990 (N.D.Ohio 2009). *See also United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996) ("An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search.").[13]

In addition to having been given permission to search by plaintiff, defendants correctly point out that the search occurred after an Ohio court issued a search warrant. *See* Doc. 21-3. "Law enforcement may rely on judicially secured warrants for immunity from civil liability unless the circumstances are such that the warrant was so lacking in indicia of probable cause, law enforcement's reliance upon the existence of probable cause was unreasonable." *Steinkamp v. Pendleton County, Ky.*, 2011 WL 1324455, at*9 (E.D.Ky. March 31, 2011) (citing *Malley*, 475 U.S. at 345). In other words, "[o]fficers may be held liable under § 1983 for an illegal search or seizure where the officer knowingly and deliberately, or with a reckless disregard for the truth makes false statements or omissions that create a falsehood and such statements or omissions are material, or necessary, to the finding of probable cause." *Id.* (citations and internal quotation marks omitted).

---

[13]"Consent is not valid when it is obtained during an unconstitutional seizure of the person." *Jenkins*, 92 F.3d at 436, n.1. However, plaintiff did not address the seizure issue as it pertains to the improper search claim in her brief and, in any event, the search was accomplished pursuant to a search warrant.

A nonmoving party must present affirmative evidence to defeat a properly supported motion for summary judgment. *Street*, 886 F.2d at 1479. Defendants have presented evidence that plaintiff consented to the search and that the search was effectuated pursuant to a facially valid search warrant. Plaintiff has offered no response. Defendants accordingly are entitled to summary judgment on plaintiff's improper search claim.

**F. Motion to Strike**

Plaintiff has moved to strike exhibits A and C to defendants' motion for summary judgment because the exhibits "were not provided in Defendants' Rule 26(a) disclosures or any other time prior to their appearance in conjunction with the Defendants' motion for summary judgment." Doc. 25, p. 1. Exhibit A contains a copy of the state court records of the criminal prosecution of the males. Doc. 21-2. Exhibit C is a difficult to read, partially redacted copy of a document which purports to be from the IRS to an unidentified person setting forth the proper uses for a taxpayer identification number.

Defendants contend the motion to strike should be denied because Exhibit A consists of public documents and Exhibit C was recovered from the search of plaintiff's office. Notably, defendants do not contest plaintiff's contention that the exhibits were not timely provided in discovery. In fact, though defendants attached the exhibits to their motion for summary judgment, defendants now admit that the exhibits have "limited relevance to the claims and defenses herein . . . ."[14] Doc. 29, p. 3.

The Court expects all parties to fully comply with their discovery obligations. The exhibits should have been provided in defendants' initial disclosures. *See* Fed.R.Civ.P.

---

[14]It is unclear why defendants attempted to use admittedly irrelevant documents.

26(a)(1)(A)(ii) (requiring a party to provide to other parties, without awaiting a discovery request, "a copy--or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment . . . ."). At a minimum, the exhibits should have been provided as supplemental discovery. *See* Fed.R.Civ.P. 26(e) (requiring supplemental disclosures if a party "learns that in some material respect the disclosure or response is incomplete or incorrect . . . ."). Because defendants failed to timely and fully provide the exhibits to plaintiffs in discovery, and because defendants have not provided a substantial justification for their failure to comply with their discovery obligations, the motion to strike will be granted. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

### III. Conclusion

For the reasons stated herein, it is **ORDERED**:

1. Plaintiff's motion for partial summary judgment [Doc. 22] is **denied**; and

2. Defendants' motion for summary judgment [Doc. 21] is **granted** as to plaintiff's malicious prosecution and unlawful search and seizure claims and **denied** as to plaintiff's false arrest claim; and

3. Plaintiff's motion to strike [Doc. 25] is **granted**; and

4. United States Magistrate Judge Candace Smith will conduct a settlement conference. Judge Smith's office will contact counsel to determine mutually agreeable dates for the

conference.

This the 24th day of January, 2012.

Signed By:

J. Gregory Wehrman

United States Magistrate Judge